08wf17037a-ord.wpd

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JAMES H. BAXTER, et al.,** : | |
| : | **Case No. 1:08-WF-17037** |
| **Plaintiffs,** : | |
| : | **JUDGE O'MALLEY** |
| v. : | |
| : | **MEMORANDUM AND ORDER** |
| **LINCOLN ELECTRIC CO., et al.,** : | |
| : | |
| **Defendants** : | |

For the reasons stated below, the Court now rules on these pending motions: (1) defendants' motion for an Order from the Court allowing them to undertake an independent medical examination involving electrophysiological testing of plaintiff James Baxter (docket no. 92) is **GRANTED**; and (2) plaintiff's motion to remand this case to the Southern District of Mississippi after completion of pre-trial proceedings (docket no. 89) is **DENIED**.

**I.     Defendants' Motion for IME.**

At defendants' request, Mr. Baxter earlier submitted to an independent medical examination ("IME") performed by Dr. Oscar Gershanik, a neurologist hired by defendants. Dr. Gershanik diagnosed Mr. Baxter as suffering from tremors that were psychogenic, as opposed to organic.[1] Defendants then requested Mr. Baxter to submit to a second IME involving electrophysiological testing by Dr. Robert Chen, who is a neurophysiologist specializing in using such testing to analyze

---

[1] A psychogenic movement disorder is "non-organic," meaning it is not caused by any actual, physical degeneration in the brain; rather, it is psychological in origin.

tremors. Mr. Baxter refused, insisting one IME was enough. Accordingly, defendants now seek an Order directing Mr. Baxter to submit to electrophysiological testing performed by Dr. Chen.

Essentially the same circumstances arose earlier in another *Welding Fume* MDL bellwether case known as *Byers*. *See Byers v. Lincoln Elec. Co.*, 2008 WL 3200277 (N.D. Ohio Aug. 5, 2008). In that case, plaintiff Byers submitted to an IME by defendants' neurologist, Dr. Lang, who diagnosed Byers' myoclonic twitches as being psychogenic, as opposed to organic. Defendants then asked Byers to submit to a second IME involving electrophysiological testing by Dr. Chen. Byers declined, arguing that: (1) Dr. Lang had reached his diagnosis of psychogenicity without electrophysiological testing, and Dr. Chen's second IME would not change Dr. Lang's opinion; (2) electrophysiological testing is beset with methodological limitations, making the final results susceptible to error; and (3) in any event, electrophysiological testing is not conclusively diagnostic of whether myoclonus is psychogenic or organic.

The Court rejected each of these arguments, concluding defendants had "carried their burden of showing good cause for the proposed electrophysiological testing by Dr. Chen." *Id.* at *3. The Court noted that, even though "Dr. Chen's test results are merely helpful diagnostic tools, rather than final, conclusive indicators," any methodological limitations were "[no] more serious than those inherent in many other, useful, empirical medical examinations," and the final test results might "provide relevant and valuable evidence directed at the most critical question in this case: causation." *Id.* The Court further noted that "[c]ritical to [its] conclusion is the fact that the proposed electrophysiological testing will not be psychologically or physically invasive of Mr. Byers, nor is it at all unsafe; and at the same time there is a general consensus in the medical community that the tests can help with diagnosis." *Id.* at *4. The Court thus issued the requested

Order, conditioned on defendants' "pay[ing] for the costs of the examination, and also . . . travel[ing] to a location near Mr. Byers' home to perform the IME." *Id.* Finally, the Court observed that, even though it had allowed the second IME, the Court's Order did not "address in any way the question of admissibility of any of the evidence that Dr. Chen obtains, nor any portion of Dr. Chen's opinions that rely on such evidence." *Id.* These were matters left for trial.

In this case, plaintiff Baxter offers three reasons why the Court should reach a conclusion different than it came to in *Byers*. First, Mr. Baxter makes exactly the same arguments as plaintiff Byers did – that is, a second, electrophysiological IME won't yield a definitive diagnosis, won't change Dr. Gershanik's opinion no matter what the test results are, and won't add evidence valuable enough to justify the burden of a second IME. Baxter apparently hopes his presentation is more persuasive than was Byers', but the Court concludes these earlier-rejected arguments remain unconvincing. On these points, the Court adopts here the reasoning it set out in the *Byers* opinion.

Second, Mr. Baxter points to details in the methods Dr. Chen actually used during his IME in *Byers*, and the testimony he actually offered, and asserts these methods and testimony did not pass *Daubert* muster; accordingly, Dr. Chen should not be permitted to undertake an IME in this case, because the methods and testimony he will subsequently offer will not be admissible. This argument fails for the simple reason that the alleged weaknesses in the methods Dr. Chen used in *Byers* are not relevant to this case, because the methods Dr. Chen will employ in this case are not the same. Even accepting that Baxter properly raises issues of admissibility premised on *Daubert* before the IME has even occurred (as opposed to after Dr. Chen performs the IME and then issues an expert opinion), the alleged methodological infirmities in Dr. Chen's examination of Byers' are techniques

3

that Dr. Chen will not be using in his examination of Baxter.[2] Thus, this argument is unpersuasive.

Finally, Mr. Baxter asserts he should not have to undergo electrophysiological testing because it would be extremely stressful for him, since he suffered a severe electrocution accident in 2000. The Court is very sensitive to this argument; as the Court observed in *Byers*, it was critical that the "proposed electrophysiological testing will not be psychologically or physically invasive." *Id.* at *4. Ultimately, however, a review of the requirements for and mechanisms of the proposed electrophysiological testing leaves the Court convinced that the tests should not, in fact, make Mr. Baxter uncomfortable. Unlike nerve conduction testing or needle electromyography – which involve insertion of needles into muscle tissue and administration of electric shock – the tests Dr. Chen proposes to administer involve simply the taping of sensors to Mr. Baxter's skin. These sensors measure only existing electrical current in Mr. Baxter's muscles; there is no transmission of outside electric current. The procedure is completely benign and painless.

Accordingly, the Court grants defendants' motion as follows. Defendants shall pay for the costs of the examination by Dr. Chen, and Dr. Chen shall travel to a location near Mr. Baxter's home

---

[2] Specifically, in *Byers*, Dr. Chen: (1) identified the presence and duration of "pre-movement [electrical] potential" in certain muscles just prior to the plaintiff's myoclonic jerks; and (2) then "back-averaged" these measurements and compared the final assessment to known reference numbers, to determine whether the jerks were organic or psychogenic. Mr. Baxter points to alleged shortcomings in Dr. Chen's methodology, including (a) back-averaging too few total measurements, and (b) choosing the wrong pre-movement point to begin measurement, allegedly in order to force the final assessment to read "psychogenic."

Regardless of whether these alleged methodological shortcomings are valid, the fact is that Mr. Baxter – as opposed to Mr. Byers – does not suffer from myoclonic jerks. Mr. Baxter suffers from tremor. Electrophysiological examination and analysis of whether *tremor* is organic or psychogenic does not depend on measuring pre-movement potential or back-averaging; rather, it depends more heavily on accelerometric measurements of the amplitude, frequency, vector, entrainability, and distractability of the tremors. Thus, the alleged shortcomings of Dr. Chen's methods and opinions in *Byers* do not support a conclusion that Dr. Chen's methods and opinions will be inadmissible in this case, and so do not undermine defendants' argument of "good cause."

to perform the IME (unless Mr. Baxter agrees otherwise). Further, Dr. Chen will perform the testing at a time that both he and Mr. Baxter find convenient. The testing shall not take any longer than necessary and in no event longer than three hours. Dr. Chen will not perform any other type of testing or examination of Mr. Baxter. No counsel may be present during the examination. The parties shall agree on other particulars as necessary, with the help of the Special Master if required.

## II.     Plaintiff's Motion for Remand.

Mr. Baxter originally filed his complaint in Mississippi state court, and defendants removed the case to federal court. The MDL Panel then transferred the case to this Court, as related to the *Welding Fumes* MDL. With this motion, Mr. Baxter invokes 28 U.S.C. §1407 and asks that, "upon completion of pre-trial proceedings," the Court remand his case to the federal transferor court, the United States District Court for the Southern District of Mississippi, for trial. Defendants object to this request and argue Mr. Baxter waived his right of remand to the transferor court.

Somewhat similar circumstances arose earlier in another *Welding Fume* MDL bellwether case known as *Solis*. *See Solis v. Lincoln Elec. Co.*, 2006 WL 266530 (N.D. Ohio, Feb. 1, 2006). The *Solis* opinion recounts that, early in the litigation of this MDL, "[t]he parties and the Court agreed that an appropriate mechanism to assess the strengths and weaknesses of the parties' different positions would be for this Court to preside over a number of 'bellwether trials.'" *Id.* at *1. These were cases that would "be tried before this Court" in the Northern District of Ohio and would include both "plaintiff's picks . . . and defendants' picks." *Id.* at *2. The *Solis* case was a

defendants' pick.[3] After his case was chosen, however, Solis invoked 28 U.S.C. §1407 and moved for remand to the transferor court in the Southern District of Texas for trial.

Section 1407 is a venue statute that directs MDL transferee courts to remand cases to their transferor courts "at or before the conclusion of . . . pretrial proceedings." The Supreme Court has characterized this statutory directive as an "unconditional command," creating "an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36, 35 (1998). But this Court, in its *Solis* opinion, noted that the §1407 obligation to remand is not impervious to the plaintiff's own waiver:

> A critical qualifier to the *Lexecon* analysis, however, is that §1407(a) is not a jurisdictional limitation, but simply "a venue statute that . . . limits the authority of courts (and special panels) to override a plaintiff's choice." [*Lexecon*, 523 U.S.] at 42; *see In re: Carbon Dioxide*, 229 F.3d at 1326. This qualifier is critical because "venue is personal and waivable." *Catz v. Chalker*, 142 F.3d 279, 284–85 (6th Cir. 1998), *amended*, 243 F.3d 234 (6th Cir. 2001). Thus, a plaintiff may decide not to raise an otherwise-valid objection to venue and "consent to remain in the transferee district for trial." *Manual for Complex Litig. Fourth* § 21.132 at 224.

*Solis*, 2006 WL 266530 at *4.

Given the totality of the circumstances in *Solis*, this Court found that, despite his motion for remand, "there is no question but that Solis [earlier] consented to trial in the transferee district and has waived any objection based on venue." *Id*. at *4. This conclusion rested on the fact that the undersigned had, when first discussing the bellwether trial concept, "raised the *Lexecon* issue with the parties and informed plaintiffs that any designated [bellwether] trial candidates would need to: (1) have filed their actions directly in this Court; (2) waive any venue objections they might have;

---

[3] More specifically, pursuant to Court order, defendants identified seven candidates whom defendants believed were "more representative of the mass of plaintiffs, generally, than the plaintiffs' picks," and plaintiffs then chose *Solis* from those seven candidates. *Id.* at *2.

or (3) cure venue issues by re-filing their complaints in this Court." *Id.* The Court reasoned that, "because the plaintiffs in this [MDL] joined the defendants in 'explicitly request[ing]' that this MDL court try all of the bellwether cases, and themselves chose to designate Solis (as distinct from some other plaintiff from defendants' list of candidates for the third bellwether trial), Solis's argument that §1407(a) now requires this Court to remand his case to the Southern District of Texas, where it originated, is not well-taken." *Id.* (quoting *Carbon Dioxide*, 229 F.3d at 1322).

The Court also addressed the fact that trial counsel in *Solis* was different than Plaintiff's MDL Lead Counsel: "it has always been clear that plaintiffs' lead counsel in this case was speaking for all those plaintiffs who were candidates for bellwether trials, including those on the defendants' list of candidates for the third bellwether trial. Plaintiffs have not suggested that the parties' general agreement to hold all of the bellwether trials in the Northern District of Ohio did not work to bind a specific bellwether plaintiff (such as Solis); still, the Court makes clear here that any such argument would be a rewriting of history." *Id.* at *5 n.16.

In sum, the *Solis* opinion made clear that, absent an explicit understanding otherwise: (1) any and every case chosen for a bellwether trial would be tried in the Northern District of Ohio; (2) the plaintiff in every such case, by virtue of having agreed to be among the cases that could be chosen as a bellwether, waived his right to seek remand pursuant to §1407; and (3) MDL Lead Counsel's agreements to this effect were binding on individual plaintiffs.

The lessons of *Solis* provide an easy answer to Baxter's motion for remand. *Baxter* was a "plaintiffs' pick" – Plaintiffs' MDL Lead Counsel chose it for bellwether status, and did so well after this Court issued the *Solis* opinion. Thus, there is no question but that Baxter, through counsel, knowingly and voluntarily waived his right to §1407 remand. Indeed, moving counsel's argument

7

that there was no waiver is so obviously contrary to established precedent that the Court has tried to understand why the argument was advanced at all. The answer, apparently, is that, although MDL Lead Counsel was counsel of record on the original *Baxter* complaint filed in state court, and MDL Lead Counsel chose *Baxter* as a bellwether case, the attorney who now seeks remand (and who is apparently trial counsel) did not make an appearance in this case until about four months ago. This observation makes it appropriate to reiterate the Court's warning that trial counsel in bellwether cases must familiarize themselves thoroughly with the Court's earlier Orders, whether procedural or substantive or evidentiary. Here, new trial counsel is certainly bound by the choices of the attorney who is both MDL Lead Counsel and also counsel of record on Baxter's original complaint.

To be fair, moving counsel also presents a provocative argument that the circumstances in this MDL have changed substantially since the Court's *Solis* order, to the point that a bellwether trial in this venue of another case where Mississippi law applies is no longer helpful to the MDL process. Moving counsel further notes that this MDL Court recently suggested remand of a bellwether case to the transferor court for retrial, even though the plaintiff had waived an objection to venue. *See Mann v. Lincoln Elec. Co.*, 2011 WL 3205549 at *4 (N.D. Ohio July 28, 2011) ("Although a plaintiff may decide not to raise an otherwise-valid objection to venue and consent to remain in the transferee district for trial, Congress has stated a clear preference in §1407 that cases normally return to the transferor court for trial."). These arguments – which are different than arguing there has been no waiver of venue in the first place – do give the Court some pause. The Court concludes, however, that many of the reasons recited in *Mann* for remand to the transferor court do not apply in this case, and the entirety of the circumstances in this MDL have not changed so much at this juncture that remand of *Baxter* despite clear waiver is appropriate. It is conceivable that future

changes in the entirety of the circumstances in this MDL may give the Court reason to reassess this conclusion, but the Court holds that defendants' reliance on Baxter's waiver of venue is reasonable and appropriate.

Accordingly, Baxter's motion for remand of this case to the transferor court for trial is denied.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY
UNITED STATES DISTRICT JUDGE**

**DATED**: January 12, 2012